# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

SIERRA CLUB, INC.,

                        Plaintiff,

      v.

NICOLIA READY MIX, INC.; NICOLIA
CONCRETE PRODUCTS, INC.; NICOLOCK
PAVING STONES, LLC; and ROBERT L.
NICOLIA,

                      Defendants.

---------------------------------------------------------------

Case No. 17-cv-5587

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Sierra Club Inc. by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.      This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act," "the

Act," or "CWA") to address and abate Defendants' ongoing and continuous violations of the

Act.

2.      Defendants discharge polluted stormwater runoff from their ready-mix concrete,

concrete product manufacturing, and stone cutting facilities located in Lindenhurst and Island

Park, New York, (collectively the "Facilities") into waters of the United States. These discharges

are without authorization and therefore in violation of Sections 301(a) and 402(p)(2)(B) of the

CWA, 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B). Defendant have failed to obtain coverage under

and comply with the conditions of an individual National Pollutant Discharge Elimination

1

System ("NPDES") permit or the State of New York General Permit for the Discharge of

Stormwater Associated with Industrial Activity ("the General Permit") issued by the New York

State Department of Environmental Conservation ("DEC"), in violation of Sections 402(p) of the

CWA, 33 U.S.C. §§ 1342(p), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.        Defendants' three facilities in Lindenhurst, New York are located at the following

addresses (collectively the "Lindenhurst Facilities"):

(a) 615 Cord Avenue, Lindenhurst, NY 11757. This location can be uniquely identified by

    tax block and lot numbers as District 100, Section 215, Block 2, Lot 42.001 for the Town

    of Babylon, Suffolk County, NY.

(b) 640 Muncy Avenue, Lindenhurst, NY 11757. This location can be uniquely identified by

    tax block and lot numbers as District 100, Section 215, Block 1, Lot 18.00 for the Town

    of Babylon, Suffolk County, NY.

(c) 200 Henry Street, Lindenhurst, NY 11757. This location can be uniquely identified by tax

    block and lot numbers as District 100, Section 215, Block 2, Lot 003.000 for the Town of

    Babylon, Suffolk County, NY.

The waters of the United States that are polluted by the Lindenhurst Facilities are Santapogue

Creek and the Great South Bay.

4.        Defendants' facility in Island Park (the "Island Park Facility") is located at the

following address: 3896 Long Beach Road, Island Park, NY, 11558. This location can be uniquely

identified by tax block and lot numbers as Section 43, Block 404. The waters of the United States

that are polluted by the Island Park Facility are the surrounding tributaries and channels which flow

to Hempstead Bay.

5.        Stormwater runoff is one of the most significant sources of water pollution in the

nation, comparable to, if not greater than, contamination from industrial and sewage sources.

The State of New York has designated more than 7,000 river miles, 319,000 acres of larger waterbodies, 940 square miles of bays and estuaries, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

6.     Defendants' stormwater discharges contribute to this endemic stormwater pollution problem.  Defendants engage in industrial activities such as the manufacture of ready-mix concrete and other concrete products, and preparation and cutting of stone products.  These activities involve operation and storage of industrial equipment, and much of this activity is conducted outdoors.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys, via a separate sewer system, those pollutants to the nearby waters of Santapogue Creek, a tributary of the Great South Bay, in the case of the Lindenhurst Facilities, and Hempstead Bay and surrounding tributaries and channels, in the case of the Island Park Facility.  Contaminated stormwater discharges such as those from the Facilities can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

2.      Plaintiff has complied with the notice requirements under Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1).

3.      On June 29, 2017, Plaintiff provided notice of Defendants' violations of the Act and of their intention to file suit against Defendants to: Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of DEC, as required by the Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by reference.

4.      More than sixty days have passed since the notice letter was served on Defendants and the state and federal agencies.

5.      Neither the United States nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

6.      This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

7.      Venue is proper in the Eastern District of New York pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the

violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

8.      Sierra Club is a not-for-profit environmental organization existing under the laws of the state of California, headquartered in Oakland, California.  Sierra Club has 67 chapters nationwide, including the Atlantic Chapter, composed of a number of Sierra Club groups, such as the Long Island Group.  Sierra Club's mission is to explore, enjoy, and protect the planet; to practice and promote responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.  Sierra Club achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums.

9.      Sierra Club has more than 840,000 members, of which 8,300 are members of the Long Island Group, which includes those who reside near, use, and enjoy the Great South Bay and the waters and tributaries of the Great South Bay, including Santapogue Creek, which is polluted by industrial stormwater runoff.  Sierra Club's members use and enjoy the waters that Defendants have unlawfully polluted and are unlawfully polluting.  Sierra Club and its members are actively engaged in protecting water quality in the Great South Bay and Santapogue Creek.  Water quality in the Great South Bay and Santapogue Creek directly affects the health, recreational, aesthetic, commercial, and environmental interests of Sierra Club's members.  The interests of Sierra Club's members are being, and will be, adversely affected by Defendants' failure to comply with the requirements of the Clean Water Act.

10.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

11.     Plaintiff is informed and believes, and thereupon alleges, that Defendants are corporations incorporated under the laws of the State of New York, which owns and operates the Facilities.

12.     Plaintiff is informed and believes, and thereupon alleges, that Defendant Robert L. Nicolia has authority over the activities at the Facilities causing unlawful discharges of polluted stormwater to waters of the United States, and environmental compliance generally, in that he is the Chief Executive Officer of the Defendant corporations.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

13.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA Section 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

14.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States without a NPDES permit.  A NPDES permit requires dischargers of pollution to comply with various limitations.

15.     NPDES permits are issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures

compliance with the procedural and substantive requirements of the CWA.  *See* 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

16.     In New York, DEC has been delegated the authority to issue NPDES permits.

## Stormwater Permits

17.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

18.     Pursuant to Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

19.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

20.     Sections 402(p) of the Act and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

21.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

22.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow melt runoff, and surface runoff and drainage.

23.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") code 3273 (ready mixed concrete), as well as other in the 32 group.

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

24.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current version of the "Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity," Permit No. GP-0-12-001 (the "General Permit") came into effect on October 1, 2012.

25.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must obtain coverage under the General Permit and comply with its terms, or obtain coverage under and comply with an individual NPDES permit.

26.     To obtain coverage under the General Permit, a facility discharging stormwater associated with industrial activity is required to submit to DEC a registration form called a "Notice of Intent" to be covered under the General Permit.

27.     In order to comply with the General Permit, a facility owner or operator must reduce the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

28.     The owner or operator also must comply with numeric effluent limitations on the quantity and concentration of pollutants discharged from the facility established in the General Permit, as well as narrative ("non-numeric") effluent limits established in the General Permit.

29.     Typically, facility owners and operators reduce pollution to the extent practicable through use of the best available technology, and comply with effluent limitations, by adopting "best management practices" that reduce the discharge of polluted stormwater.  Best

management practices include both changes to industrial practices and activities (for example, more frequent inspections and site clean ups) and structural changes to the property that prevent stormwater from coming into contact with pollutants in the first place and that otherwise reduce the amount of polluted stormwater eventually discharged from the facility.

30.     Before submitting a registration form to DEC, the owner or operator of a facility discharging stormwater associated with industrial activity must first prepare, make available, and implement a Storm Water Pollution Prevention Plan ("SWPPP").  Among other things, the SWPPP must document the best management practices that the facility has implemented to ensure that it is reducing the discharge of pollution from the facility to the extent practicable through use of the best available technology.

31.     In addition, the owner or operator must perform inspections, conduct monitoring and sampling, and meet other requirements of the General Permit.  The SWPPP must establish a plan for and document compliance with these inspection, monitoring, sampling, and other requirements as well.

## CWA Citizen Enforcement Suits

32.     Under CWA Section 505(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.  33 U.S.C. § 1365(a)(1).

33.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  *See* CWA Section 505(f), 33 U.S.C. § 1365(f).

34.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

35.     Injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a).

36.     Violators of the Act are also subject to an assessment of civil penalties of up to $52,414 per day per violation.  *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (updating statutory penalties to adjust for inflation).

## V.

## STATEMENT OF FACTS

### Control of Industrial Activities

37.     On information and belief, Defendants currently control industrial operations at the Facilities.

38.     Defendants maintain websites that advertise themselves as the operators of the Facilities located at the above-mentioned addresses, and describe the nature of Defendants' industrial activities, as described below.

39.     Because Defendants control the industrial activities that take place at the Facilities, Defendants are responsible for managing the stormwater at the Facilities associated with those activities in compliance with the CWA.

40.     The Defendants are the persons, as defined by 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

### Industrial Activities at the Lindenhurst Facilities Expose Pollutants to Stormwater

41.     The activities and practices of Defendants at the Lindenhurst Facilities expose materials and pollutants to stormwater.

42.     Defendants' activities at the Lindenhurst Facilities include, but are not limited to, the purchase, collection, processing, and outdoor storage of sand, aggregate, and other substances used in manufacturing, loading, and delivering ready mix concrete and other concrete products. In addition, Defendants manufactures other stone products at the Lindenhurst Facilities, which manufacture includes cutting, storing, and transporting various stone and other industrial materials. All of these activities include operation and storage of industrial equipment, and much of this activity is conducted outdoors. In carrying out these activities at the Lindenhurst Facilities, Defendants store and handles industrial materials in a manner that exposes pollutants to precipitation and snowmelt.

43.     Polluted stormwater from the Lindenhurst Facilities migrates offsite, to nearby storm drains that discharge to Santapogoue Creek, which empties into the Great South Bay.

44.     The stormwater discharged into Santapogue Creek from the Lindenhurst Facilities brings sand, concrete, cementitious material and other solids and sediments that suspend or dissolve in stormwater, metals such as zinc, copper, lead, cadmium, chromium, and arsenic; oil and hydraulic fluids, and other pollutants into the Creek.

45.     Trucks and other vehicles driving on and off the Lindenhurst Facilities are also point sources of pollution. The Lindenhurst Facilities use heavy vehicles and stationary machinery outdoors. Sediment-laden vehicles track pollutants offsite conveying pollution from the Lindenhurst Facilities into the street, where it is exposed to stormwater. Vehicles and industrial equipment also may expose many other pollutants to the elements, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.

46.     The Lindenhurst Facilities have open driveways, and other discharge points observable from the public street, through which stormwater runoff carrying pollutants can easily pass, allowing stormwater runoff to reach nearby streets and their storm sewers which discharge to nearby surface waters.

47.     All of these pollution sources are exposed to precipitation and snowmelt. These pollution sources also may release fuel, oil, lubricants, PAHs, an array of metals, pH-affecting substances, and chemical residues. These toxic pollutants are often generated in the form of small particulate matter, which settles on the ground and other surfaces that are exposed to stormwater and non-stormwater flows

### Industrial Activities at the Island Park Facility Expose Pollutants to Stormwater

48.     Defendants' activities at the Island Park Facility include, but are not limited to, the purchase, collection, processing, and outdoor storage of sand, aggregate, and other substances used in manufacturing, loading, and delivering ready mix concrete and other concrete products. These activities include operation and storage of industrial equipment, and much of this activity is conducted outdoors. In carrying out these activities at the Island Park Facility, Defendants store and handle industrial materials in a manner that exposes pollutants to precipitation and snowmelt.

49.     Polluted stormwater from the Island Park Facility migrates offsite, to nearby storm drains and into the tributaries and canals that connect with Hempstead Bay.

50.     The stormwater discharged into Hempstead Bay from the Island Park Facility brings sand, concrete, cementitious material and other solids and sediments that suspend or dissolve in stormwater, metals such as zinc, copper, lead, cadmium, chromium, and arsenic; oil and hydraulic fluids, and other pollutants into the nearby channels that form part of Hempstead Bay.

51.     Trucks and other vehicles driving on and off the Island Park Facility are also point sources of pollution. The Island Park Facility uses heavy vehicles and stationary machinery outdoors. Vehicles and industrial equipment also may expose many other pollutants to the elements, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.

52.     All of these pollution sources are exposed to precipitation and snowmelt. These pollution sources also may release fuel, oil, lubricants, PAHs, an array of metals, pH-affecting substances, and chemical residues. These toxic pollutants are often generated in the form of small particulate matter, which settles on the ground and other surfaces that are exposed to stormwater and non-stormwater flows.

**Defendants Discharge Stormwater from the Facility to Waters of the United States**

53.     With every rain storm or snow melt, polluted stormwater discharges from the Facilities.  Stormwater containing the pollutants described above is conveyed off-site into waters of the United States through separate sewer systems.

54.     Santapogue Creek, the Great South Bay, and the channels that form part of Hempstead Bay are "waters of the United States," as defined in 40 C.F.R. § 122.2 and, therefore, "navigable waters" as defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

**Defendants have not Obtained Permit Coverage for These Discharges**

55.     As of June 29, 2017, the Facilities were not covered by an individual NPDES permit, nor were the Facilities covered by the General Permit.

56.     As of June 29, 2017, Defendants had not complied with any provisions of the General Permit.

57.     Accordingly, on June 29, 2017, Plaintiff sent Defendants via certified mail the notice of intent to sue described above and attached to this complaint.

58.     On information and belief, as of the date of the filing of this complaint the Facilities still lack NPDES permit coverage.

59.     Defendants' violations of the CWA at the Facilities are ongoing and continuous, are capable of repetition, and result from the same underlying and inadequately resolved causes.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants
### (Violations of 33 U.S.C. §§ 1311)

60.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

61.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides that the "discharge of

any pollutant" by any "person" is unlawful, unless the discharge complies with various

enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not

authorized by a valid NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C.

§ 1342.

62.     Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to include "an

individual, corporation, partnership [or] association."

63.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant"

to include "any addition of any pollutant to navigable waters from any point source."

64.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" broadly to

include, among other things, industrial wastes, chemical wastes, biological materials, rocks, sand, and

garbage discharged into water.

65.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" broadly

to include "any discernible, confined and discrete conveyance, including but not limited to any pipe,

ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal

feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

66.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the

waters of the United States, including the territorial seas."

14

67.     40 C.F.R. § 122.2 defines "waters of the United States" to include, among other things: (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries to such waters; (iv) wetlands adjacent to such waters or their tributaries; and (v) all other waters the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce.

68.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i) require that facilities discharging stormwater associated with industrial activity obtain a NPDES permit.

69.     Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

70.     Each and every day on which Defendants discharge stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

71.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

72.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Failure to Apply for NPDES Permit Coverage
### (Violations of 33 U.S.C. §§ 1311, 1342)

73.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

74.     40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit.

75.     Defendants have operated and continue to operate the Facilities, at which they engage in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

76.     Defendants have routinely discharged polluted stormwater associated with industrial activity from the Facilities to waters of the United States.

77.     Therefore, Defendants have been obligated to apply for coverage under individual or general NPDES permits.

78.     Once Defendants began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendants have failed to apply for permit coverage constitutes a separate and distinct violation of Sections 301and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

79.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

80.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

**Failure to Implement Adequate Control
Measures and Best Management Practices
(Violations of 33 U.S.C. §§ 1311, 1342)**

81.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

82.     The General Permit, in Parts I.B and VII, requires that Defendants implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facilities.

83.     The selected measures must reduce the discharge of pollution from the Facilities to the extent practicable through use of the best available technology for the industry in order to comply with both numeric and narrative effluent limits contained in the permit.

84.     For example, the General Permit requires that Defendants minimize the exposure of pollutants to stormwater in the first place.  *See* General Permit Part I.B.1.a.2.a.  And to the extent that pollutants are exposed to stormwater despite Defendants' best efforts, the Defendants must also minimize the ultimate discharge of those pollutants in stormwater from the Facilities. *See* General Permit Part I.B.1.a.2.f.

85.     In this context, to "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice."  General Permit, Part I.B.1.

86.     To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged.

87.     Because the industrial activities carried out at the Facilities are categorized in SIC Code Group 32, Defendants must also implement the sector-specific control measures specified in Part VIII of the General Permit for Sector E.

88.     Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or BMPs as required by the General Permit.

89.     Defendants have failed, and continue to fail, to implement adequate control measures and BMPs at the Facilities as required by the General Permit.

90.     Defendants' ongoing failure to implement adequate control measures and BMPs at the Facilities as required by the General Permit is evidenced by, *inter alia*, Defendants' outdoor storage of raw materials, including aggregate and stone products, without appropriate best management practices; the continued exposure and tracking of waste resulting from the operation of vehicles at the site, including trucks; and the failure to implement effective containment practices.

91.     Each and every day on which Defendants fail to comply with the General Permit's control measure and BMP requirements is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

92.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

93.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Failure to Develop and Implement an Adequate
### Storm Water Pollution Prevention Plan
### (Violations of 33 U.S.C. §§ 1311, 1342)

94.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

95.     Part III of the General Permit requires industrial dischargers to develop,

implement and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

96.     As described in Part III.A of the General Permit, the SWPPP must identify

potential sources of pollution that may affect the quality of stormwater discharges associated

with industrial activity.

97.     Further, the SWPPP must describe how the discharger has implemented best

management practices that minimize the discharge of pollutants in stormwater and that assure

compliance with the other terms and conditions of the General Permit, including achievement of

effluent limitations.

98.     The SWPPP must address, at a minimum: (1) each of the universally applicable

elements set forth in Part III.C of the General Permit; (2) each of the applicable sector-specific

plan elements specified in Part VIII of the General Permit and, (3) as applicable, each of the

additional special requirements listed in Part III.F of the General Permit for industrial activities

that discharge through a municipal separate storm sewer or to impaired waterbodies, activities

that take place at facilities that report under the federal Emergency Planning and Community

Right to Know Act, and facilities that use secondary containment measures. The SWPPP must

include records and documentation of compliance with each of these elements and requirements.

99.     The SWPPP must be representative of current site conditions and kept up to date.

100.    The SWPPP must be signed in accordance with Part V.H of General Permit.

101.    At an active facility, the SWPPP must be kept on-site at all times.

102.    The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.

103.    Because the industrial activities carried out at the Facilities are related to the manufacture of ready-mix concrete products, other concrete products, and cut stone products, Defendants must include the sector-specific SWPPP elements specified in Part VIII of the General Permit for Sector E.

104.    Under Part III.D.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

105.    Plaintiff requested a copy of Defendants' SWPPP on June 29, 2017.

106.    Defendants have not provided a copy of a SWPPP to Plaintiff.

107.    Based on Defendant's failure to produce a SWPPP, Plaintiff alleges that, as of the filing date of this complaint, Defendants have not developed a SWPPP.

108.    Defendants have failed, and continue to fail, to develop, implement and maintain compliance with an adequate SWPPP for the Facilities as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

109.    Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facilities and to take the other SWPPP-related actions required by the General Permit is also evidenced by, *inter alia*, D Defendants' ongoing failure to implement adequate control measures and BMPs at the Facilities as required by the General Permit is evidenced by, *inter alia*, Defendants' outdoor storage of raw materials, including aggregate and stone products, without

20

appropriate best management practices; the continued exposure and tracking of waste resulting

from the operation of vehicles at the site, including trucks; and the failure to implement effective

containment practices.

110.    Each and every day on which Defendants fail to comply with the General

Permit's SWPPP requirements is a separate and distinct violation of Sections 301 and 402 of the

CWA, 33 U.S.C. §§ 1311, 1342.

111.    Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain,

speedy, or adequate remedy at law.

112.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**

**Failure to Conduct Routine Site Inspections and Comply With General
Monitoring, Recordkeeping, and Reporting Requirements
(Violations of 33 U.S.C. §§ 1311, 1342)**

113.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

114.    The General Permit requires industrial dischargers to conduct and document

comprehensive site inspections at appropriate intervals, but in no event less frequently than once

a year.  The inspection must ensure that all stormwater discharges are adequately controlled and

that all BMPs are functioning as expected.  *See* General Permit, Part IV.A.1.  Records of this

inspection must be kept for five years.  *See* General Permit, Part IV.A.2.

115.    In addition, qualified facility personnel must carry out routine inspections at least

quarterly.  *See* General Permit, Part III.C.7.b.2.  During these inspections, personnel must

evaluate conditions and maintenance needs of stormwater management devices, detect leaks and

ensure the good condition of containers, evaluate the performance of the existing stormwater

21

BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP. *See* General Permit, Part III.C.7.b.1 and b.3. Such deficiencies must then be addressed through corrective actions.

116.    And all covered facilities must conduct multiple types of analytical monitoring as described in Part IV.B of the General Permit and must keep records of their monitoring efforts in accordance with Parts IV.B and IV.E of the General Permit. The monitoring required under the General Permit includes both various visual inspections and collection and laboratory analysis of water quality samples.

117.    In addition, Defendants engage in industrial activities that fall within Sector E of the General Permit's classifications of industrial activity, and therefore must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VIII of the General Permit. *See* General Permit, Part VIII (requirements for Sector E). These include:

(a) Total suspended solids;

(b) Total Recoverable Iron; and

(c) pH.

118.    Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants had not conducted any of the site inspections, monitoring, and testing required by Parts III, IV, and VIII of the General Permit.

119.    Defendants have failed, and continue to fail, to comply with the inspection, monitoring, and testing requirements of the General Permit.

120.    Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants also have failed to retain records and submit monitoring reports as required by Parts IV and VIII of the General Permit.

121.    Each and every day on which Defendants fail to comply with any of the General Permit's inspection, monitoring, testing, recordkeeping and reporting requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

122.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

123.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to
Ready Mix Concrete Plants and Stone Cutting Facilities
(Violations of 33 U.S.C. §§ 1311, 1342)**

124.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

125.    The General Permit contains various requirements specific to ready mix concrete plants and stone cutting facilities. *See* General Permit, Part VIII (requirements for Sector E). These include:

(a)  A requirement to include in the SWPPP and annual reports to DEC a description of measures that ensure that process wastewater that results from washing of trucks, mixers, transport buckets, forms or other equipment are discharged in accordance with a separate SPDES permit or are recycled.

(b)  A requirement to identify in the SWPPP the locations of any baghouse or other dust control device; and any recycle/sedimentation pond, clarifier or other device used for the treatment of process wastewater and the areas that drain to the treatment device.

(c)  A requirement that site inspections take place while the facility is in operation and shall include all of the following areas that are exposed to stormwater:

- Material handling areas

- Aboveground storage tanks

- Hoppers or silos

- Dust collection/containment systems

- Truck wash down/equipment cleaning areas

(d) A requirement to sweep the facility weekly to prevent or minimize the discharge of cement and aggregate.

(e) A requirement to, if practicable, store cement and any other fine granular solids in enclosed silos or hoppers, buildings, or under other covering.

126.    Defendants have failed, and continue to fail, to comply with these requirements of the General Permit.

127.    Each and every day on which Defendants fail to comply with the General Permit's requirements applicable to ready mix concrete plants is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

128.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

129.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

130.   Wherefore, Plaintiff Sierra Club respectfully requests that this Court grant the following

relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

(d)  Declare Defendants to have violated and to be in violation of the Act as alleged

herein;

(e)  Enjoin Defendants from discharging pollutants from the Facilities except as

authorized by and in compliance with a NPDES permit;

(f)  Order Defendants to immediately apply for coverage under, and comply fully with all

applicable requirements of, the General Permit (or an individual permit that is at least

as stringent);

(g)  Order Defendants to take appropriate actions to remediate the harm caused by the

violations of their NPDES permit and the CWA, to the extent possible;

(h)  Order Defendants to pay, jointly and severally, civil penalties of $37,500 per day per

violation for violation occurring before November 2, 2015 and $52,414 per day per

violation occurring after November 2, 2015.as provided by Sections 309(d) and

505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 –

19.4;

(i)  Order Defendants to pay the costs of litigation, including Plaintiff's reasonable

investigative costs, attorney's fees, witness, and consultant fees, and other costs, in

accordance with Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

(j)  Award any such other and further relief as this Court may deem appropriate.

Dated this 25th day of September, 2017       Respectfully submitted,
New York, New York

By:

s/ Nicholas W. Tapert

Nicholas Tapert
Edan Rotenberg

SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038

Attorneys for Plaintiff